**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAVIN/SOLMONESE LLC., a Delaware Limited Liability Company | |
| Plaintiff, | Case No.: 1:16-cv-01086 |
| v. | Judge John R. Blakey |
| STEPHEN L. KUNKEL, an individual | |
| Defendant. | |

**GAVIN/SOLMONESE LLC'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Gavin/Solmonese LLC ("Gavin/Solmonese") by and through its undersigned attorneys, hereby files this First Amended Complaint (the "Complaint") against Defendant, Stephen L. Kunkel ("Kunkel"), and alleges as follows:

**INTRODUCTION**

1.     In September 2013, Gavin/Solmonese hired Stephen Kunkel, a 50+ year-old seasoned executive turnaround specialist, to assist Gavin/Solmonese's corporate clients with their business needs. Gavin/Solmonese assigned Kunkel to act as interim CEO of client Soo Tractor Sweeprake, a farm equipment parts producer located in Sioux City, Iowa. While assigned on that engagement, Kunkel apparently promoted young male employees to positions for which they were not qualified, materially increased their pay and benefits, provided them with gifts and loans, paid their personal debts, and from May 2014 through December 2014, on multiple occasions made them take their pants down and physically spanked their naked buttocks using belts, paddles and his hands. Based on their allegations, as well as the photographs and video produced by one of these young men, it appears the spankings caused alleged physical pain and injury and alleged emotional

distress and humiliation. As a result of Kunkel's conduct, Soo Tractor Sweeprake terminated its $250,000+ per month engagement with Gavin/Solmonese, and two of the young men brought sexual harassment and discrimination claims against Gavin/Solmonese and Soo Tractor based on Kunkel's conduct. Gavin/Solmonese has suffered damages in excess of $1 million in lost revenue, damage to reputation and costs incurred in defending and resolving the claims brought against it. Gavin/Solmonese brings this suit to hold Kunkel financially liable for these damages and seeks punitive damages in light of the willful and wanton nature of Kunkel's conduct.

## PARTIES

2.      Plaintiff Gavin/Solmonese LLC is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.

3.      Defendant Stephen L. Kunkel is an individual who formerly was employed by Gavin/Solmonese as Managing Director in Chicago, Illinois. Kunkel is a resident and citizen of the State of Illinois.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a). The parties are citizens of different states, and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

5.      This Court has personal jurisdiction over Kunkel because Kunkel is a citizen of the State of Illinois and resides within this district.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and/or 28 U.S.C. § 1391(b)(3).

130648318.7

**FACTUAL ALLEGATIONS**

A.      **Overview of Gavin/Solmonese.**

7.      Gavin/Solmonese is a management consulting firm founded in 2012.

8.      Gavin/Solmonese provides a variety of corporate turnaround solutions and organizational effectiveness strategies to a broad range of clients throughout the United States. Specifically, Gavin/Solmonese's services include litigation consulting, corporate recovery, turnarounds and interim management, mergers and acquisitions, and bankruptcy and fiduciary services.

9.      Gavin/Solmonese is often retained by companies faced with financial difficulties to provide "turnaround" services. As part of these services, Gavin/Solmonese evaluates the client's current business, provides an assessment of the distressed business and turnaround strategies available, formulates a preliminary action plan for implementing the turnaround strategy, assesses financing and organizational resources, and recommends changes as necessary.

10.     Gavin/Solmonese also assists clients in implementing these recommendations, either by providing interim management services or assisting with the sale of the business.

11.     Gavin/Solmonese's professional employees each have significant experience in advising companies on financial, organizational, and restructuring issues, as well as implementation of strategies. These professionals often step in and serve as interim management to Gavin/Solmonese's clients in order to implement recommended changes.

130648318.7

B.    **Kunkel's Employment With Gavin/Solmonese**.

12.    In or around August 2013, Gavin/Solmonese extended an offer of employment to Kunkel as Managing Director in Chicago, Illinois, contingent upon a successful background check.

13.    At the time, Kunkel's resume indicated that he had over 13 years of executive leadership experience, including 8 years of experience in interim management and corporate restructuring. Kunkel's accolades also included service on the boards of directors of several private companies and philanthropic service for religious and other charitable organizations. Kunkel also came to Gavin/Solmonese from another well-respected turnaround firm and had previously worked at other well-known and respected turnaround firms.

14.    From August 2013 through March 2014, Gavin/Solmonese paid Kunkel an annual salary of $250,000, plus discretionary bonus.

15.    Beginning April 1, 2014, Gavin/Solmonese paid Kunkel an annual salary of $300,000, plus discretionary bonus.

16.    Gavin/Solmonese also paid for the cost of Kunkel's health insurance, which totaled approximately $850 per month, and Kunkel was reimbursed for all business-related expenses pursuant to Gavin/Solmonese's expense reimbursement policy.

17.    At all relevant times, Kunkel's employment with Gavin/Solmonese was at-will.

C.    **Soo Tractor Retains Gavin/Solmonese's Services**.

18.    On or around September 27, 2013, Soo Tractor Sweeprake Co. (d/b/a Radius Steel) ("Old Soo"), a steel fabrication company that produces farming equipment, retained

4

Gavin/Solmonese to provide advisory services to address the then-current business and financial difficulties Old Soo was experiencing in its business generally and at its facilities in Sioux City, Iowa (the "Facility").

19.    Gavin/Solmonese secured this engagement based on a referral by a business contact and previous referral source of Ted Gavin's (a founder of Gavin/Solmonese), with whom Mr. Gavin had worked on a successful engagement previously.

20.    After a telephonic interview between Mr. Gavin, Mr. Kunkel, and Old Soo's then-President and outside legal counsel, Old Soo engaged Gavin/Solmonese to evaluate Old Soo's financial and operating situation, assess alternatives in addressing changes in sales revenue, and provide Old Soo with an assessment of business, operational, and financial risks and options to restore Old Soo's business to profitability.

21.    Old Soo thereafter retained Gavin/Solmonese to provide an interim Chief Executive Officer and Chief Financial Officer to assist in implementing Gavin/Solmonese's recommendations, with Kunkel acting as interim CEO and Ross Waetzman ("Waetzman"), another Gavin/Solmonese employee, acting as interim CFO.

22.    Pursuant to the parties' Management Agreement (attached hereto as **Exhibit A**), the parties agreed that Gavin/Solmonese, Kunkel, and Waetzman would perform such services as independent contractors, not employees, of Old Soo.

23.    Old Soo agreed to pay Gavin/Solmonese $180,000 per month through December 31, 2013, and beginning January 1, 2014, Gavin/Solmonese charged Old Soo an hourly rate that resulted in average monthly billings of approximately $260,000 per month, plus necessary expenses.

24.     Between October 2013 and January 2015, Kunkel and Waetzman performed services for Old Soo, and Old Soo paid Gavin/Solmonese millions of dollars for these services.

25.     Both Kunkel and Waetzman updated Old Soo's owners and management of developments directly and regularly. Old Soo's outside attorneys and owners routinely informed Gavin/Solmonese that Kunkel and Waetzman were performing well and were having success in their efforts to turn around the company and prepare it for sale.

26.     In or around December 2014, Old Soo and Gavin/Solmonese agreed to extend the terms of the Management Agreement through April 2015, and Old Soo's owners asked Gavin/Solmonese to help sell Old Soo to a new owner.

27.     At this same time, Old Soo agreed that upon closing of the sale, Gavin/Solmonese was set to receive the Success Fee set forth in Section VI(E)(2) of the Management Agreement if the sale was completed by April 30, 2015.

28.     Gavin/Solmonese expected that the Success Fee would total between $150,000 and $300,000. Gavin/Solmonese and Old Soo also agreed that Old Soo would continue paying Gavin/Solmonese's hourly fees pursuant to the Management Agreement through the closing of the sale.

29.     Beginning in or around January 2015, Gavin/Solmonese, in addition to its managerial duties, undertook the process to solicit potential purchasers, perform any necessary due diligence, and helped secure a buyer of Old Soo. The parties anticipated that sale would be completed in April 2015.

D.  **Kunkel's Interactions with Old Soo Employee, McMichael Mierau**.

30.  Although Gavin/Solmonese did not know it at the time, upon information and belief, while acting as interim CEO of Old Soo, Kunkel took a special interest in several of Old Soo's young male employees, including McMichael Mierau ("Mierau"), an assembly worker, and Alex Peterson ("Peterson"), a painter/powder coater on the assembly line.

31.  Upon information and belief, Mierau returned to work in or around February 2014 after missing some work due to a back injury.

32.  Upon information and belief, when Mierau returned to work, Mierau told Kunkel about Mierau's ongoing struggles with alcohol and substance abuse and other intimate details about Mierau's personal life.

33.  Upon information and belief, Kunkel took a special interest in Mierau's professional and personal life, and told Mierau he wanted to help Mierau succeed. Despite Mierau's lack of education and experience and substance abuse issues that impacted his job performance, Kunkel promoted Mierau to the position of Project Manager for Old Soo's newly created Special Projects Team, which came with an increase in salary and significant increase in responsibility.  In this new position, Mierau also began reporting directly to Kunkel.

34.  Upon information and belief, during this time, Mierau began to share more of his personal history with Kunkel, including Mierau's financial troubles and debt.

35.  Upon information and belief, Kunkel gave Mierau approximately $3,000 for past owed day care expenses for Mierau's children, and an additional $900 to help pay off Mierau's car loan.

130648318.7

36.     Although Gavin/Solmonese did not know it at the time, upon information and belief, in or around June 2014, Kunkel began to make statements to Mierau that Mierau "needed his behind spanked" and needed to "have his ass spanked to become a man."

37.     Upon information and belief, in or around June 2014, when Mierau and Kunkel were working late and were the only two employees remaining at the Facility, Kunkel ordered Mierau to come with Kunkel to an office, ordered Mierau to take off Mierau's belt, required Mierau to bend over one of the file cabinets and spanked Mierau on the buttocks with his belt approximately 9-10 times.  Upon information and belief, during this incident, Kunkel made comments about how Mierau needed to gain control of his finances and become a man.

38.     Upon information and belief, after this incident, Kunkel continued to recommend and approve additional promotions and wage increases for Mierau, representing that these promotions and raises were based on Mierau's work performance.

39.     Upon information and belief, Kunkel also began having Mierau assist Kunkel with taking care of Kunkel's personal and business expenses.

40.     Upon information and belief, after this first incident, Kunkel and Mierau had an argument over the phone. Upon information and belief, the next time Mierau and Kunkel worked late together, Kunkel told Mierau that Mierau was behaving like a child and would be punished for raising his voice to Kunkel.

41.     Upon information and belief, Kunkel again brought Mierau into an office, ordered Mierau to drop his pants and boxers and bend over Kunkel's knee, and Kunkel proceeded to spank Mierau's naked bottom 8-10 times, causing welting.

42.     Upon information and belief, after this second incident, Kunkel gave Mierau an additional $1,400 to pay for repairs to Mierau's personal vehicle, including new brakes and tires.

43.     Upon information and belief, in or around September 2014, Kunkel told Mierau to come with Kunkel to lunch to receive another punishment, and brought Mierau to a local Hilton Garden Inn, where Kunkel was staying.   Upon information and belief, Kunkel ordered Mierau to drop his pants and bend over Kunkel's knee and then Kunkel proceeded to spank Mierau approximately 10 times.

44.     Upon information and belief, Kunkel recommended and approved another raise for Mierau after this third alleged spanking incident. In November 2014, Kunkel even suggested to Ted Gavin that Mierau should become a member of the Board of Directors of Old Soo.

**E.     Mierau Reports Kunkel's Conduct to Gavin/Solmonese.**

45.     On or around Friday, December 19, 2014, Mierau's fiancé telephoned Waetzman and asked if he knew where Mierau was. Mierau's fiancé indicated that Mierau had a history of alcohol and drug problems, and she was concerned that she could not get in touch with Mierau.

46.     Waetzman contacted Kunkel to ask if Kunkel knew of Mierau's whereabouts, as Mierau was scheduled to work that day.

47.     Kunkel indicated that Mierau was at the Sioux City Hilton Garden Inn (the "Hilton") and was being watched to make sure he was okay.   Kunkel also provided Waetzman with the room number where Mierau was located at that time.

48. Upon information and belief, Kunkel had contacted Mierau when he did not show up for work, located where Mierau had been drinking, and arranged to have Mierau check into a room at the Hilton Garden Inn.

49. Mierau alleges that while in that hotel room, Kunkel removed Mierau's clothes, and once he was naked, Kunkel had physical sexually-oriented contact with Mierau without Mierau's consent.

50. Upon information and belief, the following day, Saturday, December 20, 2014, Mierau called Waetzman's cell phone and was notably upset and crying. Upon information and belief, during this phone call, Mierau stated that he felt like he was a prisoner and reported that Kunkel had been sexually harassing Mierau. Specifically, Mierau told Waetzman that Kunkel had been abusing Mierau by inflicting spankings on multiple occasions as punishments.

51. Upon information and belief, Mierau also reported to Waetzman that Kunkel had been providing financial assistance to Mierau and some other young male Old Soo employees, and made several references to Kunkel using this financial support to influence or take advantage of Mierau and the other young male employees.

52. That same day, Waetzman contacted Gavin/Solmonese managing director and founding partner, Ted Gavin, to inform him of his conversation with Mierau and of Mierau's accusations against Kunkel. This was the first time Gavin/Solmonese was aware of any issues or alleged wrongdoing of Kunkel.

53. Later that evening, Mierau called and informed Waetzman that Mierau was back at home, and Waetzman suggested that Mierau speak with the Old Soo human

10

resources department on Monday to discuss Mierau's allegations, and offered to accompany Mierau for this meeting.

54.     Even later that same evening, Kunkel called Waetzman and said that Waetzman was not allowed to take any further calls from Mierau's fiancé and that Kunkel would take all future calls from Mierau's fiancé. Kunkel also stated that it was doubtful that Mierau could continue to work for Old Soo.

55.     Once Waetzman informed Ted Gavin of these accusations, Gavin/Solmonese began an investigation and retained counsel to assist in that effort. Old Soo also had its outside counsel perform an investigation on behalf of Old Soo, including interviewing the Old Soo employees with potential information about Mierau's allegations.

**F.      Kunkel's Denials and Attempts to Conceal His Conduct.**

56.     When Gavin/Solmonese confronted Kunkel about Mierau's accusations, Kunkel repeatedly denied the allegations and denied any inappropriate conduct. Kunkel told Gavin/Solmonese's counsel that Mierau was an alcoholic and drug addict, and was completely fabricating the allegations against Kunkel.

57.     During the week of December 22, 2014, Gavin/Solmonese instructed Kunkel not to have any contact with Mierau until Gavin/Solmonese completed its investigation. Kunkel agreed not to contact Mierau for any reason unless and until instructed otherwise.

58.     Upon information and belief, in direct violation of Gavin/Solmonese's direction, Kunkel called Mierau on or around Saturday, December 27, 2014 to inquire about Mierau's well-being. Upon information and belief, Kunkel told Mierau that Mierau could take as much time off work as he needed.

130648318.7

59. Upon information and belief, Kunkel called Mierau again on or around December 31, 2014 and asked Mierau about what Mierau had reported about the incident at the Hilton Garden Inn. Upon information and belief, Kunkel told Mierau that Mierau should not worry about the incident, should not speak with anyone about the incident, and that if anyone were to call Mierau about the incident, Mierau should not make any statements.

60. Upon information and belief, Kunkel told Mierau that Kunkel wanted to get together with Mierau to discuss the situation and said that Mierau needed to have a cell phone so that Kunkel could get in touch with him.

61. Upon information and belief, Kunkel also told Mierau that Kunkel could help take care of Mierau's hospital debts and medical expenses.

62. Upon information and belief, Kunkel also told Mierau that Mierau did not need to repay the money that Kunkel had previously loaned Mierau.

63. Upon information and belief, on or around January 2, 2015, Kunkel met Mierau at a Verizon Wireless store and purchased a new cellular phone for Mierau.

64. Upon information and belief, Kunkel also instructed Mierau not to tell anyone that Kunkel had loaned Mierau money, and if anyone were to ask Mierau about the loan, Mierau should respond that he did not know where the money came from.

65. Upon information and belief, when Mierau expressed concern that he did not have any remaining paid time off work, Kunkel responded that Mierau could take as much time off as he needed and that Mierau would continue to be paid.

66.     Upon information and belief, Kunkel also told Mierau that an attorney from Old Soo's outside counsel was conducting an investigation into some allegations against Kunkel.

67.     Upon information and belief, Kunkel also instructed Mierau that if Mierau was contacted in connection with the investigation, Mierau should say that Kunkel did not do anything unprofessional.  Upon information and belief, Kunkel also instructed Mierau to deny that Kunkel had been in touch with Mierau after the December 2014 Hilton incident.

68.     Upon information and belief, Kunkel told Mierau that Kunkel thought it was Waetzman who had made the allegations against Kunkel, and that Mierau should stay away from Waetzman and not speak to Waetzman about Kunkel.

69.     Upon information and belief, Kunkel also suggested that Mierau should sign a statement denying that Kunkel had engaged in any inappropriate conduct and recanting anything Mierau may have said about Kunkel's misconduct.

70.     Upon information and belief, Kunkel contacted Mierau again on Monday, January 5, to confirm that Mierau would recant any accusations that Mierau had made against Kunkel if Mierau was contacted by Old Soo's outside counsel.  Upon information and belief, Kunkel again told Mierau to take as much time off work as he needed to address his health issues.

71.     Upon information and belief, Kunkel contacted Mierau again on Tuesday, January 6 and told Mierau that Kunkel told Old Soo's outside counsel that Mierau was receiving medical treatment, and that it was no longer necessary for Mierau to speak with Old Soo's outside counsel about the accusations against Kunkel, and that the matter was taken care of so Mierau did not have to worry about it anymore.

130648318.7

72.     Gavin/Solmonese became aware that Kunkel had contacted Mierau, in direct violation of Gavin/Solmonese's directions not to do so. When asked about these incidents, Kunkel initially denied the extent and nature of his contacts with Mierau, and claimed he was only attempting to assist Mierau with some employee benefits issues related to Mierau's planned stay in a halfway house.

73.     Upon information and belief, Old Soo was conducting its own investigation into the allegations and planned to interview Mierau and other Old Soo employees, but did not want Gavin/Solmonese to speak with Mierau or any other Old Soo employees about the allegations against Kunkel in connection with Gavin/Solmonese's own investigation.

74.     Because it was clear that Kunkel had refused to follow Gavin/Solmonese's directions and had been dishonest about the extent and nature of his late December/early January contacts with Mierau, Gavin/Solmonese chose to terminate its relationship with Kunkel and gave Kunkel the option to be terminated or to resign.

75.     Kunkel resigned his employment on January 30, 2015.

**G.    Old Soo Terminates its Relationship With Gavin/Solmonese.**

76.     On or around January 28, 2015, as Old Soo apparently was finishing its investigation of the Kunkel matter, Old Soo notified Gavin/Solmonese that it was terminating its engagement with Gavin/Solmonese.

77.     Old Soo's outside counsel specifically told Gavin/Solmonese that Old Soo had terminated the engagement because of Kunkel's conduct.

78.     After that time, Gavin/Solmonese did not provide services to Old Soo, and had no involvement in the business or decisions of Old Soo.

14

130648318.7

79.     Upon information and belief, the owners of Old Soo sold the assets of Old Soo to the new owner, Soo Tractor, LLC ("New Soo"). New Soo hired many of the former Old Soo employees, but either terminated or did not hire Mierau in March 2015.

80.     Although Gavin/Solmonese had sought and identified possible purchasers of Old Soo and was Old Soo's exclusive agent for the sale pursuant to its agreement with Old Soo,  Gavin/Solmonese did not receive the agreed upon anticipated under the Management Agreement due to Old Soo's decision to terminate its relationship with Gavin/Solmonese because of Kunkel's actions.

**H.      Mierau Files Claims Against Gavin/Solmonese, Soo Tractor, and Kunkel.**

81.     On or around April 15, 2015, Mierau filed a charge of discrimination with the Iowa Civil Rights Commission against Old Soo, Gavin/Solmonese, and Kunkel, alleging sex discrimination, harassment, and retaliation under the Iowa Civil Rights Act and Title VII. Specifically, Mierau alleged that (i) Kunkel had sexually harassed him by forcing him to endure spankings on several occasions, and (ii) he was terminated on March 17, 2015 in retaliation for reporting Kunkel's conduct to Old Soo.

**I.      Kunkel's Interactions with Old Soo Employee, Alex Peterson.**

82.     On or around March 20, 2015, another former young male Old Soo employee, Alex Peterson ("Peterson") filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") against Old Soo / New Soo and Gavin/Solmonese.

83.     Upon information and belief, before Kunkel began at Old Soo, Peterson had worked for Old Soo as a powder coater. After Kunkel got to know Peterson, Kunkel promoted Peterson to the Special Projects Team with Mierau and a few other young male employees and increased Peterson's pay.  With this promotion, Peterson also began

15

reporting directly to Kunkel. Upon information and belief, Peterson had no education, experience, or training for this position, and Peterson had been a consistently poor-performing employee for Old Soo with chronic absenteeism problems.

84.     Upon information and belief, in or around April 2014, Peterson missed a day of work due to a tooth ache.

85.     Upon information and belief, when Peterson returned to work, Kunkel called Peterson into an office and said that because Peterson had missed work, Peterson had to choose between having money taken from Peterson's paycheck or being spanked.  Upon information and belief, Kunkel then ordered Peterson into an office and locked the door, ordered Peterson to pull his pants and boxers down and bend over the desk, and then Kunkel proceeded to hit Peterson with a belt 20-30 times and then with Kunkel's hand several times on Peterson's naked bottom.

86.     Upon information and belief, Kunkel threatened Peterson to keep this incident between the two of them if Peterson wanted to keep his job.

87.     Upon information and belief, Peterson reported this incident to his supervisor at Old Soo, as well as to an Old Soo human resources employee, but they did not address his complaints.

88.     Upon information and belief, in or around May 2014, Kunkel again ordered Peterson into an office and asked if Peterson had told anyone about the first punishment. Upon information and belief, after Peterson denied telling anyone about the first punishment, Kunkel instructed Peterson to pull down his pants and Kunkel proceeded to again hit Peterson with a belt and Kunkel's bare hand.

89.     Upon information and belief, Kunkel spanked Peterson with a belt again in or around July 2014.

90.     Upon information and belief, also around July 2014, Kunkel also paid for Peterson's dental bills and for repairs to Peterson's personal vehicle.  Upon information and belief, Kunkel told Peterson that Kunkel would use a Company program for these expenses, but Kunkel ultimately used Kunkel's personal credit card for these payments.

91.     Upon information and belief, after Kunkel provided these payments to Peterson, in or around September 2014, Kunkel again spanked Peterson allegedly as punishment for Peterson arguing with his supervisor.

92.     Upon information and belief, while Peterson was out of work for a funeral, Kunkel repeatedly sent Peterson text messages asking Peterson to "settle up."

93.     Upon information and belief, in or around November 2014, Peterson drove Kunkel to another Old Soo facility and instructed Peterson to cut and sand a wooden paddle, ordered Peterson to pull down his pants, and used the paddle to spank Peterson's buttocks numerous times.  Peterson videotaped this incident.

94.     Upon information and belief, in or around January 2015, while Gavin/Solmonese and Old Soo were investigating the allegations about Kunkel, Kunkel ordered Peterson to take time off work under the guise of taking care of child support and custody issues in order to avoid Peterson talking with anyone as part of the investigation. Upon information and belief, while Peterson was on leave, Kunkel began calling Peterson and coming to his house uninvited, all while telling Peterson he could not return to work.

95.     In his EEOC charge, Peterson alleged that Gavin/Solmonese and Old Soo had allowed a sexually hostile work environment after Peterson reported Kunkel's alleged

sexual harassment to Old Soo, and retaliated against Peterson by terminating his employment in or around March 2015.

96.     Peterson did not claim that he contacted Gavin/Solmonese at any time to report Kunkel's behavior.

97.     Gavin/Solmonese was forced to retain legal counsel to defend against and resolve not only the charges filed by Peterson and  Mierau, but also the other potential common law and statutory claims held by the employees, at significant expense to Gavin/Solmonese.

**J.     Gavin/Solmonese Discovers Kunkel's Additional Misconduct.**

98.     After Kunkel resigned from his employment, Gavin/Solmonese discovered that Kunkel had engaged in additional misconduct, separate and apart from his conduct towards Mierau and Peterson.

99.     Gavin/Solmonese discovered that Kunkel had engaged in competitive activities during his employment with Gavin/Solmonese and had diverted potential business opportunities away from Gavin/Solmonese for Kunkel's personal gain.

100.     Specifically, on or around March 31, 2014, Kunkel identified Tamarack Ski Resort ("Tamarack") as a potential client for Gavin/Solmonese.

101.     Kunkel asked another Gavin/Solmonese employee to enter Tamarack's information into Gavin/Solmonese's Contact Relationship Management ("CRM") and lead-tracking system as a "pending" lead.

102.     Kunkel reported numerous developments in securing Tamarack as a client but, several months later, ultimately reported the lead to be "dead." Gavin/Solmonese never performed any work for Tamarack.

103.    After Kunkel's employment with Gavin/Solmonese ended, Gavin/Solmonese discovered that Kunkel had accepted an engagement with and performed services for Tamarack while Kunkel was still employed by Gavin/Solmonese.

104.    Specifically, Gavin/Solmonese learned that during his employment, Kunkel had joined Tamarack's Board of Directors and had performed services for and on behalf of Tamarack that were the very same types of services Gavin/Solmonese performs for its customers and clients.

105.    Kunkel never reported these business opportunities to Gavin/Solmonese during his employment, and did not inform Gavin/Solmonese that Kunkel had accepted an engagement on his own from Tamarack or that he joined Tamarack's Board of Directors or performed any services for Tamarack at any time.

106.    Instead, Kunkel improperly accepted this business opportunity on his own behalf, depriving Gavin/Solmonese of this business.

107.    Upon information and belief, Kunkel had asked Mierau to assist Kunkel with Kunkel's investment in or involvement with Tamarack LLC.

108.    Upon information and belief, Kunkel instructed Mierau not to tell anyone else at Gavin/Solmonese or Old Soo about Kunkel's service on Tamarack's Board of Directors.

109.    Upon information and belief, Kunkel received current or future benefits for the services Kunkel performed for Tamarack, all while Kunkel was still employed by Gavin/Solmonese.

110.    Kunkel also falsified his expense reports, by, among other things, submitting duplicate slips for the same expenses, causing him to receive multiple reimbursements for the same expense.

130648318.7

111.    Upon information and belief, Kunkel also submitted false reimbursement requests, by, among other things, requesting reimbursement for non-business expenses and for meals in cities on a date that Kunkel could not have been in the stated city.

112.    As a result of Kunkel's conduct, Gavin/Solmonese has suffered damages in lost fees and commissions from Old Soo, compensation paid to Kunkel when he was acting contrary to Gavin/Solmonese's interest, expense reimbursements improperly paid to Kunkel, attorneys' fees and costs associated with defending and resolving the claims by Mierau, Peterson and Old Soo, and other monetary damages yet to be determined.

113.    As a result of Kunkel's conduct, business and referral contacts of Gavin/Solmonese have learned of these events and it has tarnished the business reputation of Gavin/Solmonese and caused damages to Gavin/Solmonese's reputation and future business prospects.

114.    Specifically, in or around December 2014, (before Old Soo or Gavin/Solmonese were aware of Kunkel's conduct), Old Soo's outside counsel informed Gavin/Solmonese that she was aware of two separate companies unaffiliated with Old Soo that were in need of services Gavin/Solmonese provides.

115.    At that time, Old Soo's outside counsel informed Gavin/Solmonese that she planned to recommend that the two companies use Gavin/Solmonese for these services, and that she would provide the companies with Gavin/Solmonese's contact information to set up a meeting and discuss the potential business opportunities.

116.    However, after Gavin/Solmonese and Old Soo became aware of Kunkel's conduct, Old Soo's outside counsel informed Gavin/Solmonese that she could not follow through on the referrals, due to Kunkel's conduct.

130648318.7

117.    Since that time, Gavin/Solmonese has not been able to secure any additional consulting work with any Iowa companies, nor has it received any further referrals from Old Soo's outside counsel.

118.    Upon information and belief, Gavin/Solmonese's difficulties in securing additional clients in Iowa is due to the fact that other companies heard about Kunkel's conduct while providing services for Old Soo and due to the damage caused to a long-time referral source for Gavin/Solmonese.

119.    As a result of Kunkel's conduct, Gavin/Solmonese has suffered monetary damages that exceed $1 million.

## COUNT I
## BREACH OF FIDUCIARY DUTY

120.    Gavin/Solmonese repeats and realleges each and every allegation contained in Paragraphs 1 through 119 as if fully stated herein.

121.    Kunkel was employed in a position of trust and responsibility for Gavin/Solmonese.  In that capacity, Kunkel owed Gavin/Solmonese a fiduciary duty to treat Gavin/Solmonese with the utmost candor, care, loyalty, full disclosure, and good faith.

122.    Kunkel's fiduciary duties included a duty of loyalty to act in Gavin/Solmonese's best interests at all times and not to engage in conduct that would be harmful or detrimental to Gavin/Solmonese.  Kunkel accepted this position of trust and confidence.

123.    While employed by Gavin/Solmonese, Kunkel breached his fiduciary duties and his obligation to act with the utmost candor, care, loyalty, full disclosure, and good faith by engaging in inappropriate and improper conduct directed towards Old Soo's employees and by attempting to hide this conduct from Old Soo and Gavin/Solmonese.

124.    Specifically, Kunkel improperly used his position of trust and confidence with Gavin/Solmonese by recommending and approving promotions and wage increases for Mierau and Peterson for the purpose of inducing Mierau and Peterson not to report Kunkel's improper behavior, that were unwarranted and otherwise would not have occurred.  These actions were undertaken solely for Kunkel's personal benefit and were harmful and detrimental to Gavin/Solmonese.

125.    Specifically, these actions induced Mierau and Peterson not to report Kunkel's improper behavior so that Kunkel could continue engaging in the same improper behavior in the future and to hide his improper behavior from his employer, Gavin/Solmonese, in violation of Kunkel's duty to act with the utmost candor, full disclosure, and good faith in his position of trust and confidence with Gavin/Solmonese.

126.    Kunkel's actions in recommending and approving these promotions and wage increases for the Old Soo employees violated Kunkel's duty to act in Gavin/Solmonese's best interest at all times and not to engage in conduct that would be harmful or detrimental to Gavin/Solmonese.

127.    While employed by Gavin/Solmonese, Kunkel further breached his fiduciary duty of loyalty and his obligation not to act in his own interest at the expense of Gavin/Solmonese's interests by usurping actual and/or potential corporate opportunities rightfully belonging to Gavin/Solmonese, without Gavin/Solmonese's knowledge or consent.

128.    Specifically, Kunkel breached his fiduciary duty of loyalty and his obligation not to act in his own interest at the expense of Gavin/Solmonese's interests by requiring Old Soo employees to assist Kunkel in improperly usurping and misappropriating

22

corporate opportunities belonging to Gavin/Solmonese for Kunkel's personal financial gain.

129.    Kunkel's actions constituted self-dealing at the expense of Gavin/Solmonese, in breach of Kunkel's fiduciary duties to Gavin/Solmonese.

130.    Kunkel's actions as described above were outside the scope of any lawful business pursuits.

131.    Kunkel's breaches of his fiduciary duties deprived Gavin/Solmonese of the fair and full value of Kunkel's services while he was employed by Gavin/Solmonese.

132.    Kunkel knew or reasonably should have known that Kunkel's self-dealing actions of usurping corporate opportunities properly belonging to Gavin/Solmonese was harmful to Gavin/Solmonese.

133.    Kunkel also knew or reasonably should have known that Kunkel's actions would cause Old Soo to terminate its agreement with Gavin/Solmonese and expose Gavin/Solmonese to claims and potential litigation by Old Soo and its employees.

134.    Kunkel also knew or should have known that his actions would be harmful to Gavin/Solmonese's reputation and would cause Gavin/Solmonese to suffer damages.

135.    As a direct, proximate, and foreseeable consequence of Kunkel's breaches of his fiduciary duties to Gavin/Solmonese, Kunkel caused Gavin/Solmonese to suffer economic damage in an amount to be determined at trial, including, but not limited to, lost profits, reimbursement of all sums paid to Kunkel during the period of his breach, and reimbursement of all costs incurred by Gavin/Solmonese in defending and resolving all future claims against Gavin/Solmonese held by Old Soo's former employees.

136.     Kunkel's actions were intentional, malicious, and/or committed with reckless disregard for the rights and interests of Gavin/Solmonese.

137.     Because of the willful and malicious nature of Kunkel's conduct, and his abuse of his position of trust, the imposition of punitive damages is warranted.

**WHEREFORE,** Gavin/Solmonese prays for judgment in its favor and against Kunkel in an amount to be determined at trial in excess of $1 million, and for any such additional and further relief that this Court deems appropriate.

## COUNT II
## UNJUST ENRICHMENT

138.     Gavin/Solmonese repeats and realleges each and every allegation contained in Paragraphs one through 1 through 137 as if fully stated herein.

139.     Upon information and belief, Kunkel's conduct, as alleged above, including his unfair competition with Gavin/Solmonese through his usurpation of corporate opportunities rightfully belonging to Gavin/Solmonese, conferred a benefit on Kunkel.

140.     Kunkel has unjustly retained the benefit of his improper conduct, and has been unjustly enriched in an amount to be determined at trial, and Gavin/Solmonese is entitled to disgorgement of any and all profits, earnings, and compensation attributable to Kunkel's wrongful actions.

141.     Kunkel's actions as described above were outside the scope of any lawful business pursuits.

142.     Kunkel's retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

143.     Kunkel's actions were intentional, malicious, and/or committed in reckless disregard for the rights and interests of Gavin/Solmonese.

144.    Because of the willful, malicious and/or reckless nature of Kunkel's conduct, and his abuse of his position of trust, the imposition of punitive damages is warranted.

**WHEREFORE,** Gavin/Solmonese prays for judgment in its favor and against Kunkel in an amount to be determined at trial in excess of $1 million and for any such additional and further relief that this Court deems appropriate.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACT**

145.    Gavin/Solmonese repeats and realleges each and every allegation contained in Paragraphs 1 through 144 as if fully stated herein.

146.    At all times material to this case, Gavin/Solmonese had an existing contract with Old Soo to provide services as set forth in the Management Agreement.

147.    Kunkel had actual and/or constructive knowledge of this agreement between Gavin/Solmonese and Old Soo.

148.    Upon information and belief, despite this knowledge and without justification, Kunkel intentionally interfered with this agreement by engaging in the conduct as alleged above, including, but not limited to, engaging in inappropriate conduct with Old Soo employees that Kunkel knew or should have known would cause Old Soo to terminate its agreement with Gavin/Solmonese.

149.    Kunkel knew or reasonably should have known that Kunkel's actions would be harmful to Gavin/Solmonese and would deprive Gavin/Solmonese of continued payments from Old Soo through the sale of Old Soo as well as the expected  commission upon closing of the sale of Old Soo.

150.    Kunkel's actions as described above were outside the scope of any lawful business pursuits.

130648318.7

151.    As a direct, proximate, and foreseeable consequence of Kunkel's intentional interference, Old Soo breached its agreement to continue to provide monthly payments for Gavin/Solmonese's services at least through the conclusion of the sale and to pay Gavin/Solmonese a commission upon consummation of the sale, causing Gavin/Solmonese to suffer economic damages in an amount to be determined at trial.

152.    Kunkel's actions were intentional, malicious, and committed in reckless disregard for the rights and interests of Gavin/Solmonese.

153.    Because of the willful and malicious nature of Kunkel's conduct, and his abuse of his position of trust, the imposition of punitive damages is warranted.

**WHEREFORE,** Gavin/Solmonese prays for judgment in its favor and against Kunkel in an amount to be determined at trial in excess of $1 million and for any such additional and further relief that this Court deems appropriate.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

154.    Gavin/Solmonese repeats and realleges each and every allegation contained in Paragraphs 1 through 153 as if fully stated herein.

155.    Gavin/Solmonese had a reasonable expectancy of continuing its relationship with Old Soo and receiving its hourly fees for all services performed, at least through the sale of Old Soo's business, in accordance with Gavin/Solmonese's agreement with Old Soo in or around October 2013 which was affirmed by Old Soo's sole shareholder in November 2014 and which continued through the date on which Old Soo notified Gavin/Solmonese of Old Soo's decision to terminate the Management Agreement.

156.    Gavin/Solmonese also had a reasonable expectancy and of receiving the agreed-upon Success Fee set forth in the Management Agreement upon closing of the sale

26

of Old Soo, also in accordance with Gavin/Solmonese's agreement with Old Soo in or around November 2014.

157.    Gavin/Solmonese also had a reasonable expectancy in entering into future business relationships based on referrals from Old Soo if Old Soo were satisfied with Gavin/Solmonese's services.

158.    Specifically, Old Soo's owners had charged Gavin/Solmonese to sell Old Soo, and Gavin/Solmonese and Old Soo agreed to extend the terms of the Management Agreement through consummation of the sale and to continue paying Gavin/Solmonese's hourly rates through the end of the sale.  Old Soo also agreed to pay Gavin/Solmonese the Success Fee set forth in the Management Agreement if the sale closed by April 30, 2015.

159.    Kunkel was fully aware of Gavin/Solmonese's reasonable expectancy that it would continue its business relationship with Old Soo at least until the sale of Old Soo.

160.    Kunkel was also fully aware that Gavin/Solmonese had a reasonable expectancy to obtain future business opportunities  based on referrals from Old Soo and/or Old Soo's outside counsel if Old Soo and its outside counsel were satisfied with Gavin/Solmonese's services.

161.    Upon information and belief, Kunkel was specifically aware that Old Soo's outside counsel planned to recommend Gavin/Solmonese's services to two companies unrelated to Old Soo.

162.    Kunkel was also fully aware that Gavin/Solmonese had a reasonable expectancy to obtain future business opportunities based from other referral sources and clients based on its strong reputation and favorable brand name in the market.

163.   On information and belief, despite having knowledge of Gavin/Solmonese's continuing expectancies, Kunkel purposefully and without justification interfered with Gavin/Solmonese's reasonable expectancies and valid business expectancies, including future business opportunities, by engaging in the improper and wrongful conduct as alleged above, including, but not limited to, engaging in inappropriate conduct with Old Soo employees that Kunkel knew or should have known would cause Old Soo to terminate Gavin/Solmonese's services, would deprive Gavin/Solmonese of a valuable referral source and would interfere with Gavin/Solmonese's future business opportunities.

164.   Kunkel knew or reasonably should have known that Kunkel's actions would be harmful to Gavin/Solmonese and would deprive Gavin/Solmonese of its legitimate and valid business expectancies.

165.   As a direct, proximate, and foreseeable consequence of Kunkel's intentional interference, Kunkel actions in fact deprived Gavin/Solmonese's of its legitimate and valid business expectancies.

166.   Specifically, Kunkel's intentional interference deprived Gavin/Solmonese of the monthly billings through consummation of the sale of Old Soo, as well as the Success Fee that Old Soo had agreed to pay Gavin/Solmonese upon closing of a sale of Old Soo.

167.   Kunkel's intentional interference also specifically deprived Gavin/Solmonese of the two business opportunities previously identified by Old Soo's outside counsel which Old Soo's outside counsel would have referred to Gavin/Solmonese but for Kunkel's misconduct.

168.   Kunkel's actions as described above were improper and outside the scope of any lawful business pursuits.

130648318.7

169.    Kunkel's intentional interference caused Gavin/Solmonese to suffer economic damages in an amount to be determined at trial.

170.    Kunkel's actions were purposeful, improper, intentional, malicious, and committed in reckless disregard for the rights and interests of Gavin/Solmonese.

171.    Because of the willful and malicious nature of Kunkel's conduct, and his abuse of his position of trust, the imposition of punitive damages is warranted.

**WHEREFORE,** Gavin/Solmonese prays for judgment in its favor and against Kunkel in an amount to be determined at trial in excess of $1 million and for any such additional and further relief that this Court deems appropriate.

**COUNT V**
**FRAUD**

172.    Gavin/Solmonese repeats and realleges each and every allegation contained in Paragraphs 1 through 171 as if fully stated herein.

173.    Kunkel also engaged a scheme to defraud Gavin/Solmonese for Kunkel's own personal gain.

174.    Specifically, Gavin/Solmonese employees are required to submit documentation of business expenses through Gavin/Solmonese's time and expense reporting program in order to receive reimbursement of these business expenses. Employees are also required to indicate the particular client to which each business expense relates.

175.    Kunkel falsely stated that he was entitled to reimbursement from Gavin/Solmonese with the intent to fraudulently induce Gavin/Solmonese into paying Kunkel for business expenses that were improperly charged multiple times or fabricated,

and Kunkel's statements did in fact fraudulently induce Gavin/Solmonese into paying Kunkel for these improperly charged business expenses.

176.     Kunkel's false statements were material because Gavin/Solmonese would not have provided these payments to Kunkel if it would have known of Kunkel's fraudulent conduct.

177.     By submitting these expense reimbursement requests, Kunkel intended that Gavin/Solmonese rely on Kunkel's statements to Gavin/Solmonese's detriment.

178.     Gavin/Solmonese reasonably relied on Kunkel's false statements because Kunkel was a high-level professional employee and Gavin/Solmonese relied on him to act in Gavin/Solmonese's best interests.

179.     Kunkel also intentionally concealed his fraudulent scheme by billing these expenses to different expense codes so that the entries would not appear next to each other when Gavin/Solmonese was reviewing the monthly expense reports.

180.     Kunkel's actions as described above were outside the scope of any lawful business pursuits.

181.     As a direct, proximate, and foreseeable consequence of Kunkel's false and fraudulent statements, Kunkel caused Gavin/Solmonese to suffer damages in an amount to be determined at trial.

182.     Kunkel's actions were intentional, malicious, and committed in reckless disregard for the rights and interests of Gavin/Solmonese.

183.     Because of the willful and malicious nature of Kunkel's conduct, and his abuse of his position of trust, the imposition of punitive damages is warranted.

**WHEREFORE,** Gavin/Solmonese prays for judgment in its favor and against Kunkel in an amount to be determined at trial, and for any such additional and further relief that this Court deems appropriate.

<u>**JURY DEMAND**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues for which a jury trial is available.

Dated:  April 21, 2016      Respectfully submitted,

                GAVIN/SOLMONESE LLC


                By: _/s/ Craig T. Boggs_____
                   One of Its Attorneys

                Craig T. Boggs
                cboggs@perkinscoie.com
                Amy L. Hunter
                ahunter@perkinscoie.com

                Perkins Coie LLP
                131 South Dearborn Street, Suite 1700
                Chicago, IL 60603-5559
                312.324.8400


                Brian L. Shaw
                bshaw@shawfishman.com

                Shaw Fishman Glantz & Towbin LLC
                321 N. Clark St., Suite 800
                Chicago, IL 60654
                312.666.2833

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 21, 2016, I filed the foregoing using the Court's ECF system which caused the same to be served upon the following:

> Michael Z. Gurland
> The Gurland Law Firm
> 414 North Clay Street
> Hinsdale, IL 60521
> (312) 420-8812
> mzg@gurlandlawfirm.com

> _/s/_ Craig T. Boggs
> Craig T. Boggs (ct25429)
> Perkins Coie LLP
> 131 South Dearborn Street, Suite 1700
> Chicago, IL 60603
> (312) 324-8400
> (312) 324-9400 (facsimile)
> CBoggs@perkinscoie.com

130648318.7