## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Gavin/Solmonese LLC.,

      Plaintiff,

      v.

Stephen L. Kunkel,

      Defendant.

Case No. 16-cv-1086

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This case involves a dispute between Plaintiff, Gavin/Solmonese LLC, and its former employee, Defendant Stephen L. Kunkel. Plaintiff filed its First Amended Complaint (FAC) on April 21, 2016, asserting claims for: (1) breach of fiduciary duty (Count I); (2) unjust enrichment (Count II); (3) tortious interference with contract (Count III); (4) tortious interference with prospective economic advantage (Count IV); and (5) fraud (Count V). [19].

On May 9, 2016, Defendant filed a motion to dismiss, [24], which this Court granted as to Counts III, IV, and V, but denied as to Counts I and II. [35].

Defendant now seeks summary judgment on Plaintiff's remaining breach of fiduciary duty and unjust enrichment claims. [100]. Defendant also seeks to strike certain statements from two declarations introduced in opposition to the motion for summary judgment. [111]. For the reasons stated below, this Court denies Defendant's motion for summary judgment and denies Defendant's motion to strike.

1

## I.    Background & Evidentiary Issues

The following facts come from Defendant's Local Rule 56.1 statement of facts [99], Plaintiff's response to Defendant's statement of facts, [106], Plaintiff's Local Rule 56.1 statement of additional facts, [107], and Defendant's response to Plaintiff's statement of additional facts, [116].[1]

### A.    Defendant's Motion to Strike

Defendant moves this Court to strike certain portions of the Declarations of Ross Waetzman (Waetzman Declaration), [109], and Edward T. Gavin (Gavin Declaration), [108], as improper summary judgment evidence. [111]. Specifically, Defendant maintains that: (1) both declarations attempt to create issues of fact by contradicting sworn deposition testimony; and (2) the Gavin Declaration contains an intentionally false statement. [112] at 1. As such, Defendant asks this Court to strike the otherwise relevant statements under the Sham Affidavit Doctrine.

#### 1.    The Sham Affidavit Doctrine

Regarding the Sham Affidavit Doctrine, the Seventh Circuit has held that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). Thus, when deciding summary judgment motions, "courts must disregard contradictory affidavit

---

[1] At the parties' motion hearing, Defendant orally moved for this Court not to consider the Declaration of Gail Meinen, [110-11] Exhibit NN, and "notes" written by Ross Waetzman, [124], because Plaintiff failed to timely file them. Because this Court need not consider or otherwise rely upon either document in its analysis, it denies Defendant's motion as moot.

statements that are material to the motion and that create a "sham" factual dispute." *Arce v. Chi. Transit Auth.*, 311 F.R.D. 504 (N.D. Ill. 2015).

To determine whether a contradictory statement constitutes a "sham," courts in this circuit "examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the jury." *Id.* (citing *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 488 (7th Cir. 2007)). The Seventh Circuit has made clear that courts should make this determination "with caution," as credibility and weight are generally issues of fact for the jury, and "we must be careful not to usurp the jury's role." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004) (citing *Bank of Illinois*, 75 F.3d at 1170). Therefore, the Sham Affidavit Doctrine applies "upon a threshold determination of a 'contradiction,' which only exists when the statements are 'inherently inconsistent'" and the discrepancies are "incredible and unexplained." *Id.*; *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (quoting *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001)). In contrast, when the change is "plausible and 'the party offers a suitable explanation such as 'confusion, mistake, or lapse in memory,'" a change in testimony affects only its credibility, not its admissibility." *McCann*, 622 F.3d at 751 (citing *Commercial Underwriters*, 259 F.3d at 799).

### 2.  The Waetzman Declaration

Waetzman works as a director for Plaintiff.   [110-4] Exhibit E at 4.[2] Defendant's counsel deposed Waetzman as a 30(b)(6) representative on May 25, 2017. *Id*. at 1.  Defendant argues that while under oath, Waetzman admitted that he was aware Defendant sat on the Tamarack Ski Resorts (Tamarack) Board of Directors, and that Defendant informed Waetzman that he was traveling and on calls related to Tamarack business while working at Soo Tractor.  [112] at 2.  Specifically, the deposition testimony is as follows:

> Q: Are you aware whether or not [Defendant] disclosed that he sat on a number of boards of directors when he began to work at –
>
> A: The only board that I'm aware of that he was on was Tamarack.  And he asked me – he said that I would help him with that kind of work, that that's something we could do together.  And then later on he indicated that he was just doing that work on his own.  And he started asking people at [Soo Tractor] to help him with that work.

[110-4] Exhibit E at 89.   Defendant contends that this deposition is therefore inconsistent with Waetzman's declaration, which states: "[Defendant] did not disclose that he was a Board Member of the Tamarack Board."  [109] ¶ 6.  Due to this discrepancy, Defendant argues that Plaintiff violated the Sham Affidavit Doctrine and that this Court should strike paragraph six of the Waetzman Declaration.  [112] at 7.

This Court denies Defendant's motion to strike paragraph six of the Waetzman Declaration.   First, consistent with paragraph six, Waetzman repeatedly testified

---

[2] In some instances, Plaintiff has filed multiple exhibits under a single docket number.  To prevent confusion when citing to such an exhibit, this Court will clarify both the docket number and the individual exhibit letter.

that while Defendant worked for Plaintiff, Waetzman did not know Defendant sat on Tamarack's Board. *See, e.g.*, [110-4] Exhibit E at 88, 93−94, 98−99. Waetzman's statement that "[t]he only board that I'm aware of that [Defendant] was on was Tamarack. And . . . he said that I would help him with that kind of work," admittedly creates some confusion when taken out of context. *Id*. at 89. But, it remains consistent with Waetzman's immediately preceding answer: "I understood that [Defendant's Tamarack work] was an engagement that [Defendant] . . . was performing for Gavin/Solmonese. I now understand that [Defendant] was doing [Tamarack Board member] work without Gavin/Solmonese's knowledge." *Id*. at 88. A complete reading thus demonstrates that Waetzman simply elaborated upon his earlier belief that Defendant worked with Tamarack only on Plaintiff's behalf. This testimony does not constitute a contradiction "inherently inconsistent" with paragraph six. *Flannery*, 354 F.3d at 638. Rather, it is, at most, a statement of "confusion" that ultimately affects "credibility, not its admissibility." *McCann*, 622 F.3d at 751. This Court therefore declines to strike paragraph six of the Waetzman Declaration, [109] ¶ 6, and instead reserves any credibility disputes for the jury.

### 3.    The Gavin Declaration

Gavin serves as Plaintiff's President. [99] ¶ 12. Defendant's counsel deposed Gavin on June 21, 2017. [110-3] at 1. Defendant identifies a variety of deposition statements as contradicting Gavin's Declaration. [112] at 2−6. For example, Defendant argues that: (1) Gavin admitted in his deposition testimony that he knew of only McMichael Mierau's allegations against Defendant prior to Soo Tractor's

terminating Plaintiff, and did not know about Alex Peterson's allegations, [110-3] at 92; (2) Gavin admitted that prior to Plaintiff's termination, he was not aware of Peterson's allegations against Defendant, *id.* at 124; and (3) on January 28, 2015—the day after Soo Tractor terminated Plaintiff—Gavin wrote an email to Soo Tractor's owner Allen Mahaney, for the first time mentioning Mierau's allegations against Defendant, [110-3] at 91. [112] 2−6.

Defendant argues that these deposition statements conflict with the Gavin Declaration, which states, in relevant part:

> ¶ 15: In late December 2014, [Plaintiff] learned that [Defendant] had sexually harassed and spanked young male **subordinates** at Soo Tractor.

> ¶ 16: When confronted with allegations that [Defendant] had sexually harassed and spanked young male **subordinates** at Soo Tractor, [Defendant] denied these allegations.

> ¶ 17: **Shortly after Defendant denied these allegations** of sexual harassment and spanking, [Plaintiff's] counsel received a recording that Alex Peterson, **one of [Defendant's] victims**, had made of one of the incidents. [Plaintiff's] counsel informed me of this recording.

> ¶ 18: On the morning of January 28, 2015, before receiving a letter from Soo Tractor terminating [Plaintiff's] services, I sent Mahaney an email informing him of the **allegations** regarding [Defendant].

[108] ¶¶ 15−18 (emphasis added).

This Court declines to strike any portion of Gavin's Declaration. First, Defendant argues that by using the plural "subordinates," paragraph 15 "falsely states" that, in late December 2014, Plaintiff knew of allegations that Defendant had sexually harassed and spanked *multiple* young male subordinates at Soo Tractor. [112] at 7. But, looking at Gavin's deposition testimony as a whole, this Court finds

6

that this is an issue of credibility for the jury to decide. Gavin's deposition testimony clearly states that by December 20th he had been informed about Mierau's allegations, which included statements that Defendant had spanked another employee in addition to Mierau. [110-3] at 91; [110-5] Exhibit I at 56−57, 147. Thus, the testimony does not constitute a contradiction that is "inherently inconsistent" with paragraph 15. *Flannery*, 354 F.3d at 638.

Second, Defendant argues that the order of paragraphs 15 through 18 "gives the false impression that Gavin informed Mahaney about multiple employee allegations against [Defendant] on January 28, 2015." [112] at 8. Absent any showing that the Gavin Declaration testimony actually contains false statements, rather than it simply giving a possible false impression based upon the order of its paragraphs, this Court declines to apply the Sham Affidavit Doctrine. *See Flannery*, 354 F.3d at 638 (Explaining that courts should apply this doctrine "with caution" so as to not "usurp the jury's role.") (citing *Bank of Illinois*, 75 F.3d at 1170).[3]

Third, Defendant argues that the ordering of paragraphs in the Gavin Declaration also "creates the false impression that Gavin informed Mahaney about more details, including that the allegations were sexual in nature and involved spanking." [112] at 8. Not so. The relevant email, referenced in Gavin's testimony, clearly states that "a deeply troubled employee raised allegations directed at

---

[3] Plaintiff's argument that "Gavin's Declaration insinuates that paragraphs 15−18 occurred in chronological order, creating the false impression that prior to January 28, 2015, [Plaintiff] received a recording of one of the incidents from Peterson", [112] at 8, fails for this same reason.

[Defendant]." [110-13] Exhibit VV; [110-3] at 91.  Paragraph 18 merely reflects this exact language and is therefore not contradictory in any way.

Thus, this Court denies Defendant's motion to strike.  [111].

## B.    The Parties

Plaintiff is a management consulting firm that provides corporate turnaround solutions and organizational effectiveness strategies to clients throughout the United States.  [110-4] Exhibit E at 17−18.  As part of these services, Plaintiff evaluates a client's current business, provides an assessment, and formulates a preliminary action plan for implementing a turnaround strategy.  *Id.*; [110-3] at 33.  Occasionally, Plaintiff also assists clients in executing its recommendations, either by providing interim management services or assisting with the sale of the business.  *Id.* at 34−35.

In August 2013, Plaintiff hired Defendant as Managing Director of its Chicago, Illinois office.  [99-2].  In this role, Defendant served as an "at-will employee," rather than a corporate officer or director.  [99] ¶ 4.  Plaintiff paid Defendant an annual salary starting at $250,000, plus a discretionary bonus and Defendant's health insurance.  [99-2].  On March 31, 2015, Plaintiff increased Defendant's annual salary to $300,000.  *Id.*

In September 2013, Soo Tractor Sweeprake Co. (Soo Tractor), a steel fabrication company that produces farming equipment, retained Plaintiff to provide advisory services.  [99-3].  Soo Tractor is incorporated in Iowa and its manufacturing facilities and headquarters are located in Sioux City.  [99] ¶ 7.  In October 2013, Soo Tractor retained Plaintiff to implement its recommendations.  *Id.* ¶ 5.  The parties

8

memorialized this agreement by entering into a Management Agreement (the Agreement), effective October 21, 2013. *Id.*; [99-3]. Iowa law governs the Agreement, and both parties retained the right to terminate it at will upon seven days' notice. [99] ¶¶ 6, 9.

Under the Agreement, Plaintiff agreed to provide Soo Tractor with an interim Chief Executive Officer (CEO) to assist with implementing Plaintiff's recommendations. [99-3] at 1−2. Plaintiff selected Defendant to serve in this role. [99] ¶ 8. Pursuant to the Agreement, Defendant performed his duties as an independent contractor, rather than a Soo Tractor employee. [99-3] at 6. The parties dispute whether Defendant's CEO role required him to relocate to and perform the majority of his services for Soo Tractor in Iowa, [99] ¶ 21, as opposed to Plaintiff's Chicago office, [107] ¶ 2. Nevertheless, both parties agree that Defendant spent a significant amount of time working out of Soo Tractor's Sioux City facility. *See* [99] ¶ 8; [106] ¶ 8.

Plaintiff also appointed its President, Ted Gavin, and Defendant to Soo Tractor's Board of Directors due to the company's "unique circumstances." [110-15] Exhibit ZZ at 4. Specifically, Soo Tractor's bank conditioned any refinancing upon the company obtaining independent board members, and "Soo Tractor was under a tight timeline to receive refinancing." *Id.*; [106] ¶ 62.

### C. The "Success Fee"

Plaintiff retained a right to a "success fee" upon Soo Tractor's sale, albeit under certain circumstances. [99] ¶ 10. Specifically, the Agreement provided:

> If requested in writing by Client, Manager shall seek purchaser(s) for all or part of Client's business, and shall be Client's exclusive agent therefore. Manager shall assist Client in preparing a Confidential Sales Memorandum, canvassing prospective purchasers, obtaining execution of non-disclosure agreements in cooperation with Client's legal counsel, soliciting proposals from prospective purchasers, negotiating financing terms and documentation in cooperation with Client's legal counsel, making recommendations to Client concerning the purchase proposal(s) submitted, and supporting the due diligence process through to closing(s).

*Id.*; [99-3] at 2. Plaintiff could earn a success fee under the Agreement upon meeting three conditions: (1) Soo Tractor requesting in writing that Soo Tractor sell the business; (2) the sale closing occurring within one year from the Agreement's execution; and (3) Plaintiff performing and completing such documentation, solicitation, and due diligence tasks "routinely associated with a sale for each such transaction . . . through closing." [99] ¶ 11; [99-3] at 5.

### 1. Whether Plaintiff Modified the Agreement Through its Negative Notice Letter

The parties spend considerable time disputing the Agreement's one-year execution deadline for any sale and whether the parties extended it. Defendant contends that per its language, the Agreement—and thus the execution deadline—could "not be amended, changed, modified, or supplemented except in writing by each party, for which purposes an exchange of electronic mail or faxes clearly indicating mutual agreement shall be acceptable." *Id.* ¶ 14. Plaintiff agrees, but argues that the parties did just that in November 2014. [106] ¶ 14.

10

Specifically, Plaintiff asserts that on November 18, 2014, Ted Gavin sent a letter to Allen Mahaney, Soo Tractor's owner, through John Anderson, Mahaney's attorney. [99] ¶ 12. The letter states in relevant part:

> Dear Allen,
>
> I have received your memorandum dated November 17, 2014, a copy of which is attached. Gavin/Solmonese will carry out your wishes using our reasonable efforts as you have instructed. As you have directed, we will reset the sale timeline to start on January 2, 2015 with a goal of a completed sale no later than April 30, 2015. Accordingly, certain dates in the Management Agreement between Soo Tractor Sweeprake Co. and Gavin/Solmonese LLC will be adjusted to reflect your instructions. . . . If you have any questions related to this issue, or disagree with any of the points raised herein, please let me know immediately. Otherwise, if this is consistent with your wishes, you need do nothing – I will attach it to the executed Management Agreement and we will proceed accordingly.

[99-5].

### a.     Disputes Regarding the Letter

Neither party disputes that: (1) Mahaney never signed, nor returned, the letter, [99] ¶ 13; and (2) Anderson never indicated to Plaintiff that he received it. [99-1] at 51. The parties do dispute: (1) whether Gavin sent the letter in the first place; (2) whether the letter required a signature to be effective; and (3) if not, whether the letter reflected a prior agreement between Plaintiff and Mahaney.

First, Gavin testified that he remembers sending the letter, but admits that he cannot recall how he did so. [99] ¶ 15; [110-3] at 72. Anderson cannot recall receiving the letter. [96-6] at 94−95. The parties do not dispute that as of today, Gavin does not "have any Metadata" showing the letter's creation. [99] ¶ 17. Plaintiff notes,

however, that Gavin created the letter on a laptop that the company subsequently decommissioned, wiped, and disposed of in the normal course of business when Gavin switched to a new computer in early 2015. [110-15] Exhibit DDD at 3. Therefore, Plaintiff states that there could have been Metadata on the decommissioned laptop. [106] ¶ 17.

Second, Plaintiff maintains that the letter did not require Mahaney's signature because the letter: (1) simply reflected the parties' earlier agreement to adjust the deadline, [107] ¶ 3; and (2) as a "Negative Notice Letter," did not require a signature, [99-1] at 51. Defendant counters that the letter did not constitute writing sufficient to amend the Agreement, [116] ¶ 3, and as discussed below, did not reflect an earlier agreement between the parties.

Third, the parties dispute whether the letter memorialized an earlier directive and/or conversation between the parties about extending the one-year execution deadline. Defendant asserts that Mahaney made the decision to sell Soo Tractor in November 2014, without Plaintiff's assistance or knowledge, and planned to terminate Plaintiff as soon as he secured a confirmed buyer. [99] ¶ 60. Defendant also states that Mahaney and Gavin never agreed to a success fee for a potential 2015 sale, and in fact, Mahaney told his accountant that he "did not want [Plaintiff] involved in selling the business." [99] ¶ 18. Plaintiff counters that on November 17, 2014, Mahaney sent a memorandum to the Soo Tractor Board of Directors instructing it to sell Soo Tractor by April 30, 2015. [106] ¶ 18. At that time, Gavin and Defendant still sat on the Board of Directors, *id*., and thus Plaintiff took this as a directive to

12

assist in a sale. *Id.* ¶¶ 14, 18. Gavin also testified that around that same time, Mahaney personally told him to send a document memorializing Plaintiff's "authorization to sell the company" in order to extend the one-year deadline. *Id.* ¶ 18; [110-3] at 44−45.

### 2. The Sale Itself

Due to Plaintiff's ultimate termination, it did not secure a buyer for Soo Tractor. [99] ¶ 19. Plaintiff does, however, note that it assisted in the sale process, for example by: (1) "cleaning up the books, getting the financials closed, identifying what type of due diligence information should be marshaled and prepared for parties," [110-3] at 54; (2) enhancing Soo Tractor's operational performance and researching potential buyers, [110-4] Exhibit E at 26−28; (3) preparing a nondisclosure agreement, [110-3] at 153−54; and (4) identifying 500 target companies for sale and narrowing down that list, [110-4] Exhibit E at 28, 70.

### D. Defendant's Conduct at Soo Tractor

While assigned to Soo Tractor, Defendant engaged in misconduct toward young male employees, including: (1) approving benefits such as unlimited overtime and recommending promotions and wage increases for certain young men, despite their lack of qualifications, [107] ¶¶ 5−6; (2) doing so despite knowing that Soo Tractor wanted to limit overtime and drastically reduce operating costs, *id.* ¶ 11; and (3) giving out these benefits to young men for purposes of getting close to them and engaging in sexualized conduct, mainly spanking, *id.* ¶¶ 5, 9.[4]

---

[4] Defendant responds to many of Plaintiff's Local Rule 56.1 statements regarding the misconduct by stating merely that they are "inconsistent with the record as a whole" and "irrelevant to the several

### 1. Benefits to Specific Employees

Defendant promoted young male Soo Tractor employees—including McMichael Mierau, Alex Peterson, and Joey Perera, to positions or responsibilities for which they were not qualified. *Id*. ¶¶ 6, 8. The promotions placed these employees on the "Special Projects Team," which resolved inventory and warranty issues, among other tasks, and came with raises and unlimited overtime. *Id*. ¶ 6. For example, Defendant increased Mierau and Peterson's wages multiple times in less than a year, resulting in overall hourly pay increases in excess of 50% for Mierau and 15% for Peterson, not including overtime payments. *Id*. ¶ 7. Moreover, Defendant's misconduct included arranging for Soo Tractor to pay for Peterson's, Mierau's, and Perera's personal legal expenses at significant cost to Soo Tractor, as well as preventing Mahaney and his advisors from accessing law firm invoices to Soo Tractor that reflected these expenses. *Id*. ¶ 12.

Further, Defendant replaced or terminated employees who had confrontations with Defendant's favored employees—known as "Steve's boys"—yet failed to discipline or hold accountable "Steve's boys" who misbehaved at, or missed, work. *Id*. ¶ 13. For example, Defendant arranged for Soo Tractor to pay Peterson, Mierau, and Perera when they did not work and did not discipline them when they failed to seek prior approval for time off, but threatened other employees for taking unapproved

---

bases on which Defendant seeks, and upon which the Court should order, summary judgment." *See, e.g.*, [116] ¶¶ 5–8, 12–18, 20. Absent any reference to record evidence to dispute these statements, this Court exercises its broad discretion to enforce the local rules governing summary judgment and deems admitted the following paragraphs in Plaintiff's statement of additional facts: [107] ¶¶ 5–8, 11–18, 20. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).

time off. *Id*. ¶ 14. Defendant similarly favored certain employees by allowing them to take extended lunches, paying for expensive lunches and dinners, and providing them with free hockey tickets—all at Soo Tractor's expense. *Id*. ¶ 15. At the same time, Defendant required these favored employees to provide personal services to him, such as dog walking and working on Defendant's personal business interests. *Id*. ¶ 16.

### 2.    Physical Misconduct

Plaintiff says that Defendant made Mierau, Perera, and Peterson "take their pants down and allow him to physically spank their naked and partially clothed buttocks using belts, paddles and/or his hands while they were on the clock being paid by Soo Tractor and in Soo Tractor's offices." *Id*. ¶ 9. Defendant disputes whether he spanked Perera and Mierau. *See* [116] ¶ 9. Defendant "instructed, threatened, and/or attempted to bribe" the employee(s) he abused not to report his misconduct by: (1) recommending and approving the promotions and wage increases discussed above; (2) providing them with gifts, loans, and payment of their personal debts, as discussed above; and (3) threatening to deduct wages if employees did not submit to spanking. [107] ¶¶ 17−18, 20.

### 3.    Reporting & Investigating Defendant's Conduct

The parties agree that Peterson reported Defendant's behavior to Soo Tractor's Human Resource Director, Amanda Sturenberg, and his supervisor, Jerami Stratmeyer, before Soo Tractor terminated Plaintiff in January 2015. [99] ¶ 50; [116] ¶ 10. The parties spend considerable time, however, debating whether Peterson made

15

any additional reports before Plaintiff's termination, [106] ¶ 31, as well as whether Mierau reported Defendant's behavior before Plaintiff's termination. [106] ¶ 30; [116] ¶ 10.

For example, Plaintiff contends that on May 8, 2014, Peterson showed Stratmeyer photos of his buttocks after Defendant spanked him. [106] ¶ 31. Plaintiffs also maintain that Peterson tried to show Sturenberg the photos, but she did not want to see them. *Id.* Plaintiff also points to testimony from Plant Manager Mike Felts, who stated that a Soo Tractor employee informed him in July 2014 that Peterson had "sexual photos, connected with his relationship with [Defendant]." *Id.* ¶ 32; [110-7] Exhibit N at 39. At this time, Felts testified that he told Mahaney about "rumors" that Defendant "was doing some stuff with some of these young men," and that the "stuff" was "sexually inappropriate." *Id.* Moreover, Felts testified that around Thanksgiving 2014, Mierau called Ross Waetzman—a director for Plaintiff—sounding "very distressed, emotional, distraught" to tell him about Defendant's behavior. [106] ¶ 41; [110-4] Exhibit E at 176−178. Defendant, however, counters that Peterson never shared photos with anyone at Soo Tractor and that Mierau never reported the spanking to Soo Tractor. [116] ¶ 10; [99] ¶ 41.

In December 2014, Defendant informed Bruce Smith, outside counsel for Soo Tractor, of the various allegations against him. [99] ¶ 43; [99-21] at 48−49. Smith began an internal investigation, but never completed it or relayed details about the investigation to Mahaney, as Soo Tractor terminated his law firm's services before the investigation's completion. [99] ¶¶ 43−45. In April 2015, Mierau and Peterson

16

filed discrimination charges with the Iowa Civil Rights Commission and U.S. Equal Employment Opportunity Commission, respectively, based upon sexual harassment by Defendant.  [99] ¶ 28.

### E.    Plaintiff's Termination & Mahaney's Knowledge

On January 27, 2015, Soo Tractor terminated Plaintiff by letter.  *Id*. ¶ 50; [99-24].  Defendant maintains that Mahaney's friend, Jim Mack, and accountant, Richard Grenko, secured a buyer for Soo Tractor, and Mahaney subsequently terminated Plaintiff "because they were depleting the company's assets."  [99] ¶ 65.  Plaintiff counters that as Soo Tractor personnel escorted Waetzman out of the building upon the termination, Felts informed Waetzman that "this situation with Mierau and . . . all the other issue[s] with these young boys" caused the termination.  [106] ¶ 65; [110-4] Exhibit E at 137.

Defendant states that Mahaney first learned of the allegations against Defendant the day after Soo Tractor terminated Plaintiff—January 28, 2015—when Gavin sent Mahaney an email explaining that "a deeply troubled employee raised allegations directed at [Defendant] and it would not be appropriate to have [him] on site.  We are investigating these allegations and the company's counsel is looking over our shoulder through this process."  [106] ¶ 51; [110-3] at 91.  Plaintiff states that Gavin did not receive the termination letter until after he sent this email.  [106] ¶ 49.

Mahaney became terminally ill in 2014 and died on or about February 15, 2015.  [99] ¶ 15.

## F.     Defendant's Board Activities

Prior to accepting a position with Plaintiff, Plaintiff knew that Defendant had financial interests in various business and served on multiple corporate boards of directors.  *Id*. ¶ 90.  Specifically, Defendant disclosed to Plaintiff that he served on boards for Crownline Boats, Birch Telecom, Ames/Axia, Kil-Bar Engineering, the TWA Post-Confirmation Board of Directors, Compass Aeronautics, Zomax Technologies, and Sterling/Tenetronics, among others.  *Id*. ¶ 72.

In early 2013, prior to working for Plaintiff, Invesco Senior Secured Management (ISSM) approached Defendant about potentially sitting as an independent board member of Tamarack Ski Resorts.  *Id*. ¶ 73; [99-32] ¶ 3.  Tamarack subsequently appointed Defendant to its Board of Directors in or around March 2014. [99-32] ¶ 3.  Defendant claims that he told Gavin about this opportunity at the time Tamarack appointed him, [99] ¶ 75, and notes that Mahaney discussed Defendant's Board work with Gavin, [116] ¶ 23.  Plaintiff denies that Defendant disclosed his Tamarack board position, and counters that Mahaney's discussion with Gavin consisted of a memo in which Mahaney accused Defendant of "[p]ossibly charging Soo Tractor for time on tele-conferences with other company boards."  [110-11] Exhibit LL.  Tamarack paid Defendant $25,000 for sitting on its Board.  [106] ¶ 77.

While serving on the Tamarack Board, Defendant suggested to the Board that his firm—Plaintiff—could take over management of the ski resort.  [99] ¶ 76. Defendant identified this as a potential "lead" to Plaintiff.  [116] ¶ 23.  But, the Board ultimately chose not to change the resort's management, [99] 76, and Defendant

subsequently declared Tamarack a "dead lead" to Plaintiff. [116] ¶ 23. Plaintiff sometimes required "Steve's boys" to work on Tamarack projects while they were on Soo Tractor's clock. *Id*. ¶ 16.

## II.   Summary Judgment Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

### III.    Summary Judgment Analysis

### A.    Count I: Breach of Fiduciary Duty

#### 1.    Governing Law

Before turning to the merits of the parties' arguments, this Court first determines what substantive law applies to Plaintiff's breach of fiduciary duty claim.

Here, the parties dispute whether Illinois or Iowa law governs Plaintiff's claim. Defendant argues that under a choice-of-law analysis, the place of contracting, negotiation, performance, location of the contract's subject matter, as well as the parties' domicile, residence, incorporation, and business location, all weigh in favor of Iowa law.  [100] at 10−11.  Plaintiff counters that Illinois law applies because: (1) Illinois law formed the basis of this Court's July 2016 ruling on Defendant's motion to dismiss; (2) applying Illinois, as opposed to Iowa law, will not make a difference in the outcome of this case, and thus this Court need not perform a choice of law analysis; and (3) even under a choice of law analysis, the relevant factors require that Illinois law governs Plaintiff's claim.  [105] at 5−7.  This Court agrees with Plaintiff; because Defendant fails to identify any actual conflict between the two states' relevant laws, it need not conduct a choice-of-law analysis.

Federal courts sitting in diversity apply the choice-of-law rules of the state in which they sit. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1048 (7th Cir. 2016). In Illinois, "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014); *Spitz v. Proven Winners N. Am.,*

*LLC*, 759 F.3d 724, 729 (7th Cir. 2014) (instructing that a "choice-of-law determination is required only when the [party seeking a choice-of-law determination] has established an actual conflict between state laws."). The party seeking the choice-of-law determination "bears the burden of demonstrating" an outcome-determinative difference in the relevant laws. *Bridgeview*, 10 N.E.3d at 905.

Here, Defendant not only fails to identify such a difference between Illinois and Iowa law, but also expressly asserts that the outcome is the same under both states' laws. *See* [100] at 12, 26 (explaining that Illinois law leads to the same result as Iowa law); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state—here, Illinois.").[5] This Court thus applies Illinois law to the parties' breach of fiduciary duty dispute.

### 2. Genuine Disputes of Material Facts Exist as to Count I

To prevail on its breach of fiduciary duty claim, Illinois law requires that Plaintiff establish: (1) that a fiduciary duty existed; (2) Defendant breached that duty; and (3) that the breach proximately caused damages. *Chicago Title Ins. Co. v.*

---

[5] Moreover, for purposes of Plaintiff's breach of fiduciary duty claim, Iowa law mirrors Illinois law. Under Iowa law, an employee can be held to the same fiduciary duties as an agent, subject to liability for breach of a fiduciary duty. *PFS Distrib. Co. v. Raduechel*, 492 F. Supp. 2d 1061, 1074 (S.D.Iowa 2007) (citing *Condon Auto Sales & Service, Inc. v. Crick*, 604 N.W.2d 587 (Iowa 1999)). The duty of loyalty for an employer-employee relationship is generally confined to instances of "direct competition, misappropriation of profits, property, or business opportunities, trade secrets and other confidences, and deliberately performing acts for the benefit of one employer which are adverse to another employer." *Id*. The "key is whether the breach committed by the employee resulted in 'substantial assistance to the competitor.'" *Id*. Further, Iowa law also allows for salary forfeiture—which Plaintiff seeks as part of its damages—under such circumstances. *PFS Distrib. Co. v. Raduechel*, 574 F.3d 580, 597−598 (8th Cir. 2009).

*Sinikovic*, 125 F. Supp. 3d 769, 777 (N.D. Ill. 2015) (citing *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010)).

### a. A Fiduciary Duty of Loyalty Existed

First, Defendant argues that he worked for Plaintiff as an at-will employee, rather than a corporate officer or director, and thus that he did not owe any fiduciary duty of loyalty to Plaintiff. [100] at 9−10. But, as this Court found in its prior motion to dismiss opinion, Illinois courts have long held that employees "who are not officers or directors are also bound by fiduciary obligations." [35] at 11 (quoting *LCOR Inc. v. Murray*, No. 97 C 1302, 1997 WL 13672, at *7 (N.D. Ill. Mar. 20, 1997)); *see also Laba v. Chicago Transit Auth.*, No. 14 C 4091, 2016 WL 147656, at *6 (N.D. Ill. Jan. 13, 2016) ("Illinois law recognizes that employees, as well as officers and directors, owe a duty of loyalty to their employer") (internal citations and quotations omitted)). Moreover, these "fiduciary obligations include an undivided duty of fidelity and loyalty, which includes acting solely in the interest of the employer." [35] at 11 (citing *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001)). Thus, this Court rejects Defendant's argument that, as an at-will employee, he did not owe a fiduciary duty of loyalty to Plaintiff.

Second, Defendant argues that, at best, Defendant owed a fiduciary to Soo Tractor, rather than Plaintiff. *See* [100] at 14. But Defendant performed his duties as an independent contractor, not as a Soo Tractor employee. [99-3]. Further, Defendant received his compensation (in the form of salary, discretionary bonuses,

and healthcare) from Plaintiff, rather than Soo Tractor. [99-2]. Therefore, Defendant clearly owed Plaintiff, as its employee, a fiduciary duty of loyalty.

### b. Whether Defendant Breached a Fiduciary Duty of Loyalty

Illinois courts recognize that "self-dealing scenarios," as opposed to instances of "negligent or substandard job performance," typically form the basis for viable breach of fiduciary duty claims. *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006). Courts applying Illinois law have construed "self-dealing scenarios" to include employees "improperly competing with their employer, soliciting the employer's customers, enticing co-workers away from the employer, diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Id*. at 831 (internal citations omitted). Employees' fiduciary duties "are not limited to usurpation of the employer's interest, but extend to a myriad of infidelities and betrayals." *See Robinson v. SABIS (R) Educ. Sys.*, No. 98 C 4251, 2000 WL 343251, at *2 (N.D. Ill. Mar. 31, 2000) (citing *TMF Tool Co. v. Siebengartner*, 899 F.2d 584, 589 (7th Cir. 1990) (treasurer found liable to his employer for breach of fiduciary duty for not timely forwarding loan money, commingling funds with his own money, and not explaining the reasons for delay in forwarding loan money)).

Plaintiff argues that Defendant breached his fiduciary duty of loyalty by: (1) abusing his position to prey on young male subordinates; and (2) usurping a business opportunity from Plaintiff by way of Defendant's Tamarack board position. *See* [105] at 8, 12. Defendant argues that the record evidence demonstrates his behavior

constituted, at most, negligent or substandard job performance, and thus he did not breach a duty of loyalty as a matter of law. [100] at 15.

### i. Employee Misconduct Breach

In this Court's prior motion to dismiss opinion, it applied *Robinson* based upon Plaintiff's allegations that Defendant promoted employees to positions within Soo Tractor for which they were otherwise unqualified and paid them for periods in which they were not working. [35] at 10–12. In *Robinson*, SABIS hired Robinson as the personnel Specialist at a SABIS-operated school. 2000 WL 343251, at *1. This role required her to oversee payroll and timekeeping operations, maintain personnel records, manage school janitors, supervise safety and security operations, and oversee school facility operation and maintenance. *Id.* at *3. Robinson used this role to place "friends and acquaintances whom she had hired as janitors and security guards on the payroll as 'permanent substitute teachers,'" which resulted in higher pay than those individuals "were entitled to receive." *Id.* Further, Robinson "paid employees in non-teaching positions for work that she knew was never performed and caused one employee to be paid for a period when that employee was not even present at the school." *Id.* The *Robinson* court denied Robinson's motion to dismiss a breach of fiduciary duty claim, finding that her actions were "decidedly not in SABIS's interest and consequently constitute a breach of fiduciary duty." *Id.* At the motion to dismiss stage, this Court found Plaintiff's allegations sufficient, like those in *Robinson*, and denied Defendant's motion to dismiss as to the fiduciary duty claim. [35] at 10–12.

24

Defendant now argues that while this Court "was obligated to accept [Plaintiff's] allegations as true" when it relied upon *Robinson* at the motion to dismiss stage, the "undisputed facts now demonstrate otherwise." Not so.

The facts surrounding the employee misconduct demonstrate that there are multiple, genuine issues of material fact that preclude summary judgment for Defendant. For example, the record contains factual support that Mierau, Peterson, and Perera were promoted to positions or responsibilities for which they were not qualified on the "Special Projects Team." [107] ¶¶ 6, 8. Defendant increased Mierau and Peterson's wages multiple times in less than a year, *Id.* ¶ 7, and arranged for Soo Tractor to pay all three employees when they did not work, just as in *Robinson*. *Id.* ¶ 14; *Robinson*, 2000 WL 343251, at *1. Defendant paid for these employees' personal legal expenses, as well as for expensive lunches and dinners and hockey tickets, at Soo Tractor's expense—even though Soo Tractor wanted to limit overtime and drastically reduce operating costs. *Id.* ¶¶ 11–12, 15. Moreover, Plaintiff provides record evidence indicating that Defendant made these decisions in an effort to further his desire to "get close to" these young employees, rather than benefit Soo Tractor. *See, e.g.*, [107] ¶¶ 5, 17–18, 20. In short, there are many facts from which a reasonable jury could conclude that Defendant went beyond "negligent or substandard job performance" and engaged in self-dealing behavior, thus breaching a fiduciary duty of loyalty to Plaintiff.

### ii.    Improper Board Activity Breach

Usurping, or diverting, business opportunities from an employer constitutes a breach of the duty of loyalty under Illinois law. *See Beltran*, 426 F. Supp. 2d at 831. Plaintiff argues that a genuine dispute of fact exists as to whether Defendant usurped a business opportunity from Plaintiff by serving as a Tamarack Board member. [105] at 13. Defendant counters that "the fact that an employee allegedly did something wrong and did not tell his employer about it, does not without more, automatically mean that the employee breached a fiduciary duty." [100] at 15. But again, this Court cannot find, as a matter of law, that Defendant did not, in fact, usurp a business opportunity from Plaintiff, because the record contains disputed issues of fact on this point.

For example, Plaintiff puts forth record evidence that: (1) Defendant served on Tamarack's Board of Directors, [99-23] ¶ 3; (2) Defendant never disclosed his Tamarack board position to Plaintiff, [110-4] Exhibit E at 88, 93−94, 98−99; (3) Defendant identified Tamarack as a potential lead for Plaintiff in March 2014, but later declared that lead dead, [107] ¶ 23; and (4) during that same period, Tamarack paid Defendant $25,000 for Tamarack-related work that he did on Soo Tractor property and with Soo Tractor' employees' assistance, [107] ¶ 16.

Plaintiff counters that even if the above facts are true, Defendant could not have taken a "business opportunity" from Plaintiff because Plaintiff is not in the business of providing independent board members to companies. [99] ¶ 78. But, Plaintiff maintains that it did, at least on one occasion, serve on a company's board

26

of directors without performing any additional services for that company. [110-5] Exhibit ZZ at 4. Thus, based upon the record as a whole, this Court finds that a reasonable jury could determine that Defendant usurped a business opportunity from Plaintiff by virtue of his Tamarack board position.

### c. Whether Defendant's Alleged Breach Proximately Caused Damages

To prevail on its breach of fiduciary duty claim, Plaintiff must also establish that the alleged breaches proximately caused damages. *Sinikovic*, 125 F. Supp. 3d at 777 (citing *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010)).

Defendant argues that Plaintiff's breach of fiduciary duty claim fails as a matter of law because Mahaney decided to terminate Plaintiff for financial reasons, not because of Defendant's conduct. [100] at 16. But, the parties dispute almost every fact regarding why Mahaney terminated Plaintiff. For example, Defendant maintains that Mack and Grenko secured a buyer for Soo Tractor, and that Mahaney subsequently terminated Plaintiff "because they were depleting the company's assets." [99] ¶ 65. Plaintiff counters that as Soo Tractor personnel escorted Waetzman out of the building after the termination, Felts informed Waetzman that "this situation with Mierau and . . . all the other issue[s] with these young boys" caused the termination. [106] ¶ 65; [110-4] Exhibit E at 137.

Notably, Plaintiff also points to a memorandum Mahaney sent in November 2014 to Soo Tractor's Board of Directors, which states that he had "grave concern[s] about [Defendant's] leadership of Soo Tractor" based upon:

- Repeated delay in receipt of monthly financial reporting

27

- Overall lack of communication with [Mahaney] about the status of the company operations, issues and future plans
- Tremendous employee tension related to actions taking during the last year
- Confiscating and opening [Mahaney's] personal mail
- Accessing [Mahaney's] Radius Steel computer and email
- Travel expenses that [Mahaney] question[ed] whether they pertain to the company
- Possibly charging Soo Tractor for time on tele-conferences with other company boards
- Bringing dogs into the office . . . .

[106] ¶ 24; [110-11]. Defendant counters that this memorandum does not mention any knowledge or concern about the purported activity with Mierau or Peterson, and that Gavin's follow-up email to Anderson, dated November 14, refutes Mahaney's complaints from the memorandum. [99] ¶ 61; [99-28].

In short, there is a clear dispute as to: (1) whether Mahaney terminated Plaintiff based upon Defendant's misconduct and/or his Tamarack board activity; and (2) if so, whether the termination caused Plaintiff to lose a success fee that it otherwise would have obtained upon a sale. *See, e.g.*, [99] ¶¶ 18, 60; [106] ¶¶ 3, 17−18; [107] ¶ 3; [110-3] at 54, 153−54; [110-4] Exhibit E at 26−28, 70. Therefore, this Court reserves the question of whether Defendant's actions proximately caused damage to Plaintiff for a jury.[6]

Based upon this record, this Court cannot decide, as a matter of law, that Defendant is not liable for the breach of fiduciary duty claim. Thus, this Court denies Defendant's motion for summary judgment as to Count I. [100].

---

[6] Defendant also argues that Plaintiff, as a matter of law, is not entitled to lost earnings. [100] at 23−25. But, for these same reasons, this Court reserves the question of lost earning recovery for a jury.

### 3.    Remaining Damages Claims

The parties spend considerable time disputing, as a matter of law, whether Plaintiff can obtain the following types of damages: (1) salary forfeiture; (2) fees and costs to resolve potential claims; and (3) lost business opportunities. [100] at 20−29; [105] at 15−29.

This Court first turns to Plaintiff's salary forfeiture argument. Under Illinois law, "it has long been recognized that an agent is entitled to compensation only on a due and faithful performance of all his duties to his principal." *ABC Trans Nat. Transp., Inc. v. Aeronautics Forwards, Inc.*, 413 N.E.2d 1299, 1314 (Ill. App. Ct. 1980) (internal quotations and citations omitted). Therefore, employees forfeit their "right to all compensation paid them during the period" in which they breach their fiduciary duty of loyalty to an employer. *Id.* at 1315. Forfeiture of salary damages "are available even where the defendant employer is not otherwise injured by the breach." *Robinson*, 2000 WL 343251, at *3 n.2 (citing *ABC Trans*, 413 N.E.2d at 1315). Whether Plaintiff can receive salary forfeiture is thus tied to the viability of its breach of fiduciary duty claim. Because a genuine factual dispute exists as to whether Defendant breached his fiduciary duty of loyalty to Plaintiff, as discussed above, this Court reserves the question of salary forfeiture damages for trial.

Second, Plaintiff seeks recovery for fees and costs it spent resolving "potential claims by Peterson, Mierau, and Soo Tractor" against Plaintiff. [105] at 18. Defendant argues that recovering these damages would conflict with the Supreme Court's decision in *Northwest Airlines, Inc. v. Transportation Workers Union of*

*America, AFL-CIO*, which held that Congress did not intend to create a federal right of contribution under Title VII of the Civil Rights Act of 1964, 451 U.S. 77, 98 (1981). [100] at 22.

But, the Court in *Northwest Airlines* also noted that "federal courts, including this Court, have recognized a right to contribution under state law in cases in which state law supplied the appropriate rule of decision." 451 U.S. at 95, 97 n.38; *see also Donajkowski v. Alpena Power Co.*, 596 N.W.2d 574 (Mich. 1999) (allowing employer to bring a third-party claim against a union in gender discrimination case brought under federal *and state* anti-discrimination statutes); *Rodolico v. Unisys Corp.*, 189 F.R.D. 245, 247 (E.D.N.Y. 1999) (allowing employer to bring claim for potential New York Human Rights Law liability). In other words, the *Northwest Airlines* doctrine is "wholly inapplicable" when a claim that could result in contribution or indemnity rests upon potential liability under a state civil rights statute or other state law. *Donajkowski*, 596 N.W.2d at 579; *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 72–73 (D.D.C. 2012) (declining to dismiss employer's state law claims, which would have led to indemnification from its employee, because the employer's liability was based, in part, upon state law). Thus, this Court need not decide this issue now; if Plaintiff prevails at trial, it will be entitled to produce evidence demonstrating that it should be indemnified for claims based upon state law.

Third, Defendant argues that Plaintiff's claim for lost business opportunity damages fails as a matter of law as "speculative." [100] at 23. This Court disagrees, because Plaintiff has put forth evidence that: (1) Defendant usurped Plaintiff's

opportunity to work with Tamarack, as discussed above, *see, e.g.*, [106] ¶ 78; and (2) Plaintiff lost out on potential referrals due to Defendant's misconduct relating to young male subordinates, [116] ¶ 33. Because a genuine dispute remains as to whether Plaintiff lost any business opportunity, this Court reserves this damages question for a jury.

### B. Count II: Unjust Enrichment

Plaintiff's unjust enrichment claim similarly alleges that Defendant improperly usurped a business opportunity from Plaintiff when he served on Tamarack's Board of Directors and performed services for them. [105] at 29. To prevail on an unjust enrichment claim, Plaintiff must establish that: (1) Defendant unjustly retained a benefit to Plaintiff's detriment; and (2) Defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). Both parties base their unjust enrichment theories upon the same facts and argument as their Tamarack board-related breach of fiduciary theories. *See* [100] at 9; [105] at 29. Thus, as discussed above, a genuine dispute of material fact exists as to whether Defendant improperly usurped a business opportunity from Plaintiff. This Court therefore denies Defendant's motion for summary judgment as to Count II. [100].

## V.     Conclusion

For the reasons stated above, this Court denies Defendant's motion for summary judgment [100] and denies Defendant's motion to strike [111]. All dates and deadlines stand.


Dated:  March 12, 2019

                                    Entered:

                                    John Robert Blakey
                                    United States District Judge